# Exhibit A

C 104— Summons without Notice, Blank Court. 9-73
Personal Service.
COPYRIGHT 1973 BY JULIUS BLUMBERG, INC., LAW BLANK PUBLISHERS

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

CAROLYN CHIN,

Plaintiff

against

CH2M HILL COMPANIES, LTD., CH2M HILL INC and LEE McINTIRE,

Defendants

Index No. 101635/12

Plaintiff designates New York County as the place of trial

The basis of the venue is CPLR § 503(a); Defendants CH2M Hill Companies, Ltd. and CH2M Hill Inc reside in New York County

# Summons

Plaintiff resides at
5304 Woodlands Blvd.
Tamarac, FL 33319
County of Broward

To the above named Defendant CH2M HILL COMPANIES, LTD.

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated, February 14, 2012

Defendant's address: CH2M HILL COMPANIES, LTD.
Area Office
14 Penn Plaza
Suite 814
New York, NY 10122

[signature]
Attorney(s) for Plaintiff
Office and Post Office Address
Andrea M. Paparella, Esq.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, NY 10022

NEW YORK
COUNTY CLERK'S OFFICE
FEB 14 2012
NOT COMPARED
WITH COPY FILE

C 104— Summons without Notice, Blank Court. 9-73 Personal Service. COPYRIGHT 1973 BY JULIUS BLUMBERG, INC., LAW BLANK PUBLISHERS

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. 101635/12

CAROLYN CHIN,

Plaintiff

against

CH2M HILL COMPANIES, LTD., CH2M HILL INC and LEE McINTIRE,

Defendants

Plaintiff designates New York County as the place of trial

The basis of the venue is CPLR § 503(a); Defendants CH2M Hill Companies, Ltd. and CH2M Hill Inc reside in New York County

# Summons

Plaintiff resides at
5304 Woodlands Blvd.
Tamarac, FL 33319
County of Broward

To the above named Defendant CH2M HILL INC

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated, February 14, 2012

Defendant's address: CH2M HILL INC
Area Office
14 Penn Plaza
Suite 814
New York, NY 10122

[signature]
Attorney(s) for Plaintiff
Office and Post Office Address
Andrea M. Paparella, Esq.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, NY 10022

NEW YORK
COUNTY CLERK'S OFFICE
FEB 14 2012
NOT COMPARED
WITH COPY FILE

C 104— Summons without Notice, Blank Court, 9-73 Personal Service. COPYRIGHT 1973 BY JULIUS BLUMBERG, INC., LAW BLANK PUBLISHERS

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

CAROLYN CHIN,

Plaintiff

against

CH2M HILL COMPANIES, LTD., CH2M HILL INC and LEE McINTIRE,

Defendants

Index No. 101635/12

Plaintiff designates New York County as the place of trial

The basis of the venue is CPLR § 503(a); Defendants CH2M Hill Companies, Ltd. and CH2M Hill Inc reside in New York County

# Summons

Plaintiff resides at
5304 Woodlands Blvd.
Tamarac, FL 33319
County of Broward

To the above named Defendant LEE McINTIRE

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated, February 14, 2012
Defendant's address: LEE McINTIRE
Address Unknown

Attorney(s) for Plaintiff
Office and Post Office Address
Andrea M. Paparella, Esq.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, NY 10022

NEW YORK
COUNTY CLERK'S OFFICE
FEB 14 2012
NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| CAROLYN CHIN, Plaintiff, - against - CH2M HILL COMPANIES, LTD., CH2M HILL INC, and LEE McINTIRE, Defendants. | Index No. 101635/12 **COMPLAINT** **PLAINTIFF DEMANDS TRIAL BY JURY** |

NEW YORK
COUNTY CLERK'S OFFICE
FEB 14 2012
NOT COMPARED
WITH COPY FILE

Plaintiff Carolyn Chin ("Chin"), by her attorneys, Liddle & Robinson, L.L.P., for her Complaint against CH2M Hill Companies, Ltd., CH2M HILL INC, and Lee McIntire alleges as follows:

**THE PARTIES**

1. Carolyn Chin is a disabled Asian female.

2. Chin served as an independent director on CH2M Hill Companies, Ltd.'s Board of Directors from 2003 to 2009, when Defendants terminated her employment.

3. The Headquarters of CH2M Hill Companies, Ltd. and CH2M HILL INC (collectively referred to as "CH2") is in Denver, Colorado. CH2 is an employee-owned global firm that provides engineering, construction, operations, and related technical services to public and private clients. Its revenue each year is more than $6 billion. CH2's work is concentrated in the areas of transportation, water, energy, environment, communications, construction, and industrial facilities. CH2 employs more than 23,000 people.

4. CH2 has offices located in New York, New York.

5. Defendant Lee McIntire is the Chairman and Chief Executive Officer of CH2. Upon information and belief McIntire resides in Colorado.

6. Defendants transact business in New York.

## THE NATURE OF THE ACTION

7. This is a civil action for damages and remedies brought under the Administrative Code of the City of New York § 8-101 et seq. ("New York City Human Rights Law"). Specifically, Chin complains that she was discriminated against because of her sex, race, and disability, and retaliated against for complaining of sexual discrimination.

## STATEMENT OF FACTS

### A. Chin's Background On CH2's Board

8. In 2003, CH2 hired Spencer Stuart, Inc. ("Spencer Stuart") to conduct a search for a candidate for its Board of Directors (the "Board").

9. In mid-2003, Chin was appointed to the Board as an outside independent director.

10. During her tenure on the Board, Chin was the only female outside independent director.

11. During her tenure on the Board, Chin was the only Asian member of the Board.

12. Throughout Chin's tenure, she was qualified for her position and performed her duties in a professional and competent manner.

13. Indeed, she excelled at CH2 and was recognized for her outstanding performance.

14. During her employment with CH2, Chin maintained an office in New York City and performed work for CH2 in New York City.

15. At the time of her appointment, Ralph Peterson was the Chairman and Chief Executive Officer of CH2.

16. Chin developed a very strong working relationship with Peterson and he often cited her as being the "smartest board member."

17. Chin was a very diligent board member.

18. Chin never missed a single board meeting.

19. Chin served on more Board committees than most board members.

20. Chin visited a large number of CH2's offices.

21. Upon information and belief, Chin met with more of CH2's employees than any of the other independent board members did during her tenure.

22. Peterson and other members of CH2's senior management would often seek her advice.

23. Chin represented CH2 at various events.

24. Chin also played a very active role in key committees of the Board as well as in many strategic sessions.

25. Chin made significant contributions to CH2 with respect to strategy, marketing, and communications.

26. Chin also was the key information technology and technology person on the Board.

27. In addition to the above, Chin was a member of the Workforce Diversity Committee, until CH2 terminated her employment and her tenure on the Board.

28. As a member of the Workforce Diversity Committee, Chin worked extensively with its Chair, Bill Dehn.

29. Chin advised Dehn on how to attract and retain the best and brightest women, in an industry with few women.

30. Chin suggested a number of diversity initiatives.

31. Chin, along with Peterson and Dehn, played a key role in CH2's efforts to win the coveted and highly competitive "Catalyst Award." According to its website, "Founded in 1962, Catalyst is the leading nonprofit membership organization expanding opportunities for women and business." The Catalyst Award "annually honors innovative organizational approaches with proven, measurable results that address the recruitment, development, and advancement of all women, including diverse women."

32. Previously, while Chin served on IBM's Women's Diversity Task Force, IBM won the Catalyst Award. At the awards ceremony, she was publicly acknowledged for the role she had played in achieving the success.

33. By the end of October 2008, CH2 was on the shortlist of candidates in the running to win the Catalyst award.

**B. <u>Chin Complains Of Gender Discrimination</u>**

34. Just prior to the November 2008 Board meeting, a high-level female CH2 employee complained to Chin that CH2 had "downsized" her. After listening to the circumstances, Chin immediately offered to intercede on behalf of this female employee. She expressed disbelief at CH2's decision to terminate this employee's employment. Chin committed to helping this female employee.

35. On November 7, 2008, Chin spoke to Defendant Lee McIntire ("McIntire") about CH2's decision to terminate this female employee's employment. At the time McIntire was

serving as CH2's Chief Operating Officer, President and Group Chief Executive for the Energy Client Group, and the President and Group Chief Executive for the Industrial Client Group. At the time of Chin's November 7, 2008 conversation with McIntire, McIntire was slated to become CH2's next Chief Executive Officer ("CEO") and he had begun to act as such.

36. McIntire told Chin that this female employee was being "fired." Chin corrected McIntire and told him that she had been told the female employee was being "laid off."

37. Chin then told McIntire: "We have worked so hard to get top women in the company and I am not asking you to change a decision, but anyplace I have been, we would have given a second look."

38. McIntire responded to Chin that this female employee was "incompetent and a blowhard." This was not true. McIntire also described this female employee as follows: "She's got a big mouth and thinks she is good, but she creates problems." This was also not true.

39. Chin responded to McIntire that this female employee had "a great reputation in the market" and Chin said "I usually trust the market."

40. Chin also said to McIntire, "with the Catalyst Award, you don't want to look as if all the women start leaving as you take over."

41. McIntire expressed anger toward Chin.

42. Upon information and belief, McIntire held a bias against outspoken women. In expressing her opposition to CH2's decision to terminate the employment of this high-level female employee's employment, Chin was merely trying to act in the best interest of CH2 and cure what she believed to be an injustice.

43. Chin had conducted an investigation concerning CH2's decision to terminate this female employee's employment.

44. During her investigation, Chin concluded that McIntire had the propensity to make disparaging comments about this woman.

45. Chin concluded that McIntire had ordered the termination of this female employee's employment without conducting a proper investigation as to whether this employee's employment should be terminated.

46. Aside from comments McIntire made about this particular female employee who was being fired, Chin had heard McIntire on many occasions speak disparagingly of CH2's female Chief Financial Officer.

47. McIntire complained about the way the female CFO dressed, despite the fact that she dressed professionally. Chin told McIntire that she believed the woman dressed appropriately.

48. Chin had also heard McIntire speak disparagingly about a female Senior Vice President and Board member. He said that this woman should be able to do better having graduated first in her class, despite the fact this woman performed very well. Chin supported this woman.

49. Chin was concerned by McIntire's behavior toward women and she decided to discuss her concerns about McIntire to another outside Board member, David Price.

50. Chin also complained to Robert C. Allen, Senior Vice President and Chief Human Resources Officer at CH2 about CH2's decision to terminate this female employee's employment.

51. This female employee subsequently initiated legal action against CH2.

C. **CH2 And McIntire Discriminate Against Chin On The Basis Of Her Gender, Race, And Disability, And Retaliate Against Chin For Complaining Of Gender Discrimination And Supporting The Female Employee Whose Employment Had Been Terminated**

52. In January 2009, McIntire officially became CH2's Chief Executive Officer ("CEO") and Chairman of its Board.

53. In approximately early February 2009, McIntire called Chin to complain that she had decided to sell certain stock she owned. She had previously obtained consent from CH2's General Counsel to do so.

54. McIntire questioned Chin's "loyalty" to CH2.

55. Chin explained to McIntire that, among other things, she had incurred large medical bills.

56. On February 10, 2009, Chin sent McIntire an email again apologizing and stating that her "sale of the stock [was] certainly not a reflection of [her] belief in the company, but a matter of dire adverse circumstances." Chin attached documentation that, among other things, explained her medical condition and the costs of medical treatment which was the reason for her deciding to sell stock. She explained that "as one of the longest kidney transplant survivors in the world (35 years), [she was] encountering a number of medical challenges." She also explained that her doctors had "ruled out a brain virus, but … brain scans show[ed] damage, most likely from two incidents when [she] was clinically dead and on-going damage from poor kidney functioning." She also explained "Recent brain scans show[ed] that [she was] not getting sufficient oxygen to the brain and [she had] been advised by doctors to try hyperbaric oxygen treatments, which while prescribed by [her] doctors are considered experimental and non-reimbursable."

57. At this time, Chin was disabled due to her kidney transplants and Defendants perceived and regarded Chin to be disabled.

58. On February 11, 12, and 13, 2009, there were meetings of Board Committees and of the Board.

59. On February 13, 2009, after the Board meeting, McIntire called Chin when she was at the airport and told her, "I have decided that I don't want you to stand for re-election."

60. Chin was shocked and asked, "why?"

61. McIntire responded, "I want to get some new faces in."

62. Chin said, "but I am the newest face, you have board members that have been on for over 20 years."

63. Chin then said, among other things, "is it because you don't feel comfortable with me?"

64. McIntire stammered, "well, you have no management experience."

65. Upon information and belief, McIntire's accusation against Chin that she did not have management experience was a race-based statement made because Chin is Asian and McIntire held a stereotype against Chin that was not accurate.

66. Chin asked, "do you know anything about my background and what I do?" She explained, as an example, that she had "more management experience" than a certain male director.

67. McIntire then said, "I know you have worked on the women's issues."

68. Chin then expressed to McIntire, "under Sarbanes-Oxley, I don't think you make this decision." McIntire responded, "It doesn't matter, I will get my way." In reference to the documentation Chin had provided him days before on February 10, 2009, McIntire then said,

"I gather you have financial problems, we will pay you some fees for the year and let you sell your stock." Chin told McIntire that she would "like to discuss this in person." McIntire agreed, but this conversation never occurred.

69. Upon information and belief, McIntire decided to terminate Chin's tenure on the Board because she was a woman, an Asian, had opposed his practices with respect to female employees, and because he perceived her to be disabled.

70. After her conversation with McIntire, Chin called Jerry Geist, Lead Director of the Board.

71. Chin asked Geist if he was aware of the decision to terminate Chin's tenure on the Board. Geist denied having any such knowledge.

72. Subsequently, Chin complained to Allen about McIntire's decision.

73. After McIntire informed Chin that he did not want her to serve on the Board anymore, a special meeting occurred on approximately March 5, 2009 where Chin's seat was eliminated.

74. At the same special meeting, a man who had less management experience than Chin was re-nominated to serve on the Board.

75. Chin continued to complain to CH2, including to Geist and Allen, about the decision to end her tenure on the Board.

76. On March 24, 2009, Chin sent Allen an email where she attached her previous February 10, 2009 email to McIntire, and a copy of her resume, to show that McIntire had incorrectly characterized her experience.

77. On March 31, 2009, Chin attended the nationally publicized Catalyst Awards dinner, which was held in New York City. It was attended by approximately 1,500 business leaders.

78. Defendants wanted Chin, who was the only female outside director on the Board, to attend this dinner.

79. CH2 presented Chin at the Catalyst Awards dinner as a member of the Board.

80. Chin was the only female independent Board member at the time.

81. At the Catalyst Awards dinner, McIntire approached Chin as said, "I suppose I have to come and say, hello."

82. On April 20, 2009, Allen sent a letter to Chin informing her that her service in an official capacity as a member of the Board of Directors would end after the meeting the Board was holding in May 2009 and that her current term would be her "final term."

83. Allen's letter memorialized the service that Chin had provided to women at CH2 and stated that those women had "viewed [Chin] as both mentor and coach."

84. Shortly after Defendants eliminated Chin's seat on the Board, in approximately June 2009, they reinstated Chin's seat and filled it with a white male who was not disabled.

85. After Chin's tenure on the Board ended, Defendants continued to retaliate against Chin. For example, members of the Board would not communicate with Chin and female employees expressed fear about communicating with Chin.

86. These women were afraid that CH2 would retaliate against them if they associated with her, just as CH2 had retaliated against Chin when she opposed its decision to terminate the employment of the high-level female employee's employment.

87. Upon information and belief, Defendants have a pattern and practice of discriminating against female employees.

88. Upon information and belief, after Chin's tenure on the Board ended, CH2's women's diversity initiatives came largely to a halt.

89. Upon information and belief, the current sole outside female independent director on the Board is the lowest compensated and does not sit on key Board committees.

**FIRST CAUSE OF ACTION**
**(Gender, Race, And Disability Discrimination Under The New York City Human Rights Law)**

90. Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately set forth herein.

91. Plaintiff is a "person" under the New York City Human Rights Law, § 8-102(1).

92. Defendants are an "employer or an employee or agent thereof" under the New York City Human Rights Law, § 8-102(5) and § 8-107(1)(a).

93. By its actions detailed above, Defendants have unlawfully discriminated against Plaintiff on the basis of gender, race, and disability, in violation of the New York City Human Rights Law.

94. As a result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer substantial damages, including back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain, and mental anguish in amounts to be determined at trial.

95. Defendants' discriminatory conduct was taken with reckless indifference to Plaintiff's rights, entitling her to punitive damages under the New York City Human Rights Law.

96. As a result of Defendants' unlawful conduct, it is also liable for attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**(Retaliation Under**
**The New York City Human Rights Law)**

97. Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately set forth herein.

98. Chin opposed Defendants' unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law.

99. Defendants retaliated against Chin for having engaged in protected activity by, among other things, terminating her tenure on the Board.

100. Defendants' actions constitute retaliation against Plaintiff in violation of the New York City Human Rights Law, § 8-107.

101. As a result of Defendants' retaliation, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

102. Upon information and belief, Defendants' retaliatory actions against Plaintiff were taken with reckless indifference to Plaintiff's rights, entitling her to punitive damages under the New York City Human Rights Law.

WHEREFORE, Plaintiff prays that this Court grant judgment to her containing the following relief:

1. An award of Plaintiff's actual damages in an amount to be determined at trial for loss of compensation and professional opportunities, including an award of back pay and an award of reinstatement or front pay;

2. An award of damages in an amount to be determined at trial to compensate Plaintiff for mental anguish, humiliation, embarrassment, and emotional injury;

3. An award of punitive damages;

4. An order enjoining Defendants from engaging in the wrongful practices alleged herein;

6. An award of reasonable attorneys' fees and the costs of this action; and

7. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
February 14, 2012

LIDDLE & ROBINSON, L.L.P.

By: ______________________
Andrea M. Paparella
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, New York 10022
Tel: (212) 687-8500
Fax: (212) 687-1505
apaparella@liddlerobinson.com

*Attorneys for Plaintiff*